## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSHUA JAMES KECKLER,** | : | **Civil No.  1:23-CV-764** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY**, | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The question of whether a disability claimant can meet all of the mental and emotional demands of the workplace is often an integral part of any disability analysis. This assessment requires an Administrative Law Judge (ALJ) to evaluate both clinical and opinion evidence. Once the ALJ completes this task, it is incumbent upon the ALJ to sufficiently articulate the basis of this decision in a manner which is supported by substantial evidence and allows for meaningful judicial review.

The instant case highlights the importance of clear, factually supported articulation of a claimant's emotional impairments. The plaintiff, Joshua Keckler, has a longstanding and well-documented history of significant mental and emotional impairments marked by two themes: borderline intellectual functioning and volatile,

1

explosive episodes of anger. Keckler's treatment and clinical records are replete with references to these impairments and a treating source who has cared for Keckler for two decades has twice opined that these conditions are disabling. Initially, this treating source opinion was supported by an examining consultative source, Dr. Kathleen Ledermann, who found that Keckler's full scale IQ was 73 and concluded that he had marked to extreme limitations in carrying out complex instructions and interacting with others due to these impairments. Thus, at one time the opinion of every physician who had actually treated or examined Keckler favored his disability claim.

However, five months later the consulting examining source conducted a second evaluation of Keckler which found that he was only mildly to moderately impaired. Curiously, in this second evaluation the doctor failed to address, or even acknowledge, her prior testing results and findings which wholly contradicted her second evaluation of Keckler. Nonetheless, in rendering the decision denying this claim, the ALJ stated that Dr. Ledermann's second opinion was more persuasive than her initial judgment. In reaching this result, we find that the ALJ's analysis was flawed in two respects: The ALJ failed to sufficiently articulate the basis of this decision and the cursory articulated rationale for the decision was not supported by

substantial evidence allowing for meaningful judicial review. Therefore, we will remand this case for further consideration by the Commissioner.

## II.   __Statement of Facts and of the Case__[1]

With respect to this medical opinion issue, the administrative record of Keckler's disability application reveals the following essential facts: On May 10, 2021, Keckler applied for disability insurance and supplemental security income benefits pursuant to Titles II and XVI of the Social Security Act. (Tr. 15). In both applications, Keckler alleged an onset of disability beginning January 1, 2021. (Id.) In these applications, Keckler alleged that he was disabled due to an array of physical and emotional impairments, including lumbar degenerative disc disease, diabetes

---

[1] Our analysis of this appeal focuses primarily on the ALJ's consideration of Keckler's emotional impairments. However, our review of the record in this case discloses one other unexplained anomaly regarding the ALJ's evaluation of the medical opinion evidence concerning Keckler's physical impairments which also warrants re-examination on remand. With respect to Keckler's physical limitations, the ALJ concluded that Keckler could perform light work. In this regard, the ALJ was "persuaded by the March 2022 medical opinion of Roman Bilynsky, MD (Exhibits B5A/7-10 and B6A/7-10), that finds the claimant capable of light work." (Tr.25). However, this portion of the ALJ's decision misstates Dr. Bilynsky's report which opined as follows: "Based on the seven strength factors of the physical RFC (lifting/carrying, standing, walking, sitting, pushing, and pulling), the individual demonstrates the maximum sustained work capability of the following: **Sedentary**." (Tr. 134). While this mistake may reflect some sort of scrivener's error by either the ALJ or the physician, this unexplained inconsistency also warrants consideration on remand.

mellitus, obesity, phonological disorder, bipolar disorder, learning disorder, and attention deficit-hyperactivity disorder. (Tr. 17). Keckler was born in January of 1992, was in his late twenties at the time of the alleged onset of his disability, had a high school education, and had previously worked as a security guard at a warehouse. (Tr. 26-27, 37).

A.   **Clinical and Opinion Evidence Regarding Keckler's Emotional Impairments.**

The record in this case reveals several longstanding and persistent mental health diagnoses which limited Keckler's ability to meet the demands of the workplace on a sustained basis. This mental health history is marked by two themes: borderline intellectual functioning and volatile, explosive episodes of anger.

With respect to these psychological impairments, Keckler's academic records reveal that he graduated from high school, but Pennsylvania System of School Assessment (PSSA) standardized testing scores plainly showed that Keckler struggled in multiple spheres of intellectual functioning. Specifically, throughout his academic career, Keckler consistently scored below basic proficiency in PSSA testing for reading, math and other disciplines. (Tr. 397-430).

These academic records also documented a second significant emotional impairment for Keckler: intermittent explosive rages. In particular, school records revealed that Keckler was disciplined after he threatened another student. (Tr. 475).

Both of these emotional impairments were later thoroughly confirmed through clinical treatment and testing records. For example, in September of 2021, Dr. Kathleen Ledermann, an examining consultative physician, administered the Weschler Adult Intelligence Scale examination to Keckler. (Tr. 560-61). The results of this testing were striking, sobering, and significant. Keckler's full-scale IQ was 73, a score which placed in in the fourth percentile. His verbal comprehension index score was 70, placing him in the second percentile; his perceptual reasoning score was 77, placing him in the sixth percentile; and his working memory score of 66 was at the very lowest end of the scale, in the first percentile. (Id.)

Dr. Ledermann's September 2021 evaluation also documented Keckler's history of impulsive violence, noting that Keckler acknowledged being required at age fourteen to engage in community service after indulging in property damage and admitted that police were frequently called to his home for fights. (Tr. 588-89). This history of impulsive, erratic, volatile behavior was also clearly reflected in Keckler's extensive mental health treatment history.

5

In addition, Dr. Karen Medzoyan at Pennsylvania Counseling Services has treated Keckler's emotional impairments for nearly twenty years, since 2004. (Tr. 459). This mental health care provider also submitted treatment records documenting more than forty clinical encounters and treatment sessions with Keckler during a two-year period from 2021 through 2022. (Tr. 592-609, 710-822). These treatment records are noteworthy in several respects. First, Keckler's treatment history reveals that he has endured a persistent struggle with anger issues, a volatile temper, and episodes of aggressive behavior. (Id.) In fact, virtually every one of these more than forty treatment note addresses these anger issues in some fashion. (Id.) Further, contrary to the ALJ's suggestion that Keckler's treatment history shows steady improvement, (Tr. 19), the actual treatment notes indicate that anger management is an intractable problem for Keckler. Indeed, while some treatment notes indicated episodic improvement, on a number of occasions it was observed that Keckler's outbursts worsened over time. (Tr. 726, 758, 766). In addition, these treatment notes underscored the gravity of these emotional episodes, indicating that there have been a number of occasions when there was a need for crisis intervention to prevent potential harm by Keckler. (Tr. 739, 758, 783).

Given this extensive treatment history spanning two decades, Dr. Medzoyan twice opined that Keckler's emotional impairments were disabling. (Tr. 559-63,

701-05). In May of 2021 and June of 2022 Dr. Medzoyan completed two Mental Residual Functional Capacity Assessments relating to Keckler. (Id.)[2] These two assessments made consistent findings concerning the severity of his symptoms. Dr. Medzoyan described Keckler's prognosis as poor given his high risk of explosive anger outbursts with little provocation. (Tr. 459, 701). According to the doctor, Keckler would frequently be off task at work, and would miss work up to ten days a month. (Tr. 463, 705). Dr. Medzoyan also opined that Keckler's anger outbursts would prevent him from working on a sustained basis. (Id.)

Dr. Medzoyan also provided detailed assessments concerning the degree to which Keckler's emotional impairments would interfere with his ability to meet the demands of the workplace. In May of 2021, the doctor found that Keckler would be markedly impaired in terms of his ability to identify and solve problems; complete multi-step activities; understand and respond to social cues; interact appropriately with the general public; respond to demands; and adapt to changes. (Tr. 460-63). The doctor also concluded that Keckler was extremely impaired in terms of his ability to handle conflicts with others; respond appropriately to requests, suggestions, criticisms, correction, and challenges; keep social interactions free from

---

[2] Notably, the ALJ's decision acknowledges the first of these assessments but apparently fails to recognize the second, consistent opinion tendered by the doctor.

excessive irritability, sensitivity, argumentativeness, or suspiciousness; sustain ordinary routine and regular attendance at work; and manage psychologically based symptoms. (Id.) In addition to these extreme and marked impairments, Dr. Medzoyan found that Keckler was moderately impaired in an additional thirteen spheres of workplace activity. (Id.) By June of 2022, Dr. Medzoyan determined that Keckler was extremely impaired in the following areas: his ability to cooperate with others; ability to handle conflicts with others; ability to respond appropriately to requests, suggestions, criticisms, correction, and challenges; ability to keep social interactions free from excessive irritability, sensitivity, argumentativeness, or suspiciousness; ability to interact appropriately with the general public; ability to respond to demands; and ability to manage psychologically based symptoms. (Tr. 702-04).

Dr. Medzoyan's opinions were initially echoed by Dr. Kathleen Ledermann, a consulting source who examined Keckler in September of 2021. In the course of this evaluation Dr. Ledermann administered the Weschler Adult Intelligence Scale examination to Keckler, which disclosed that Keckler's full-scale IQ was 73, a score which placed in in the fourth percentile; his verbal comprehension index score was 70, placing him in the second percentile; his perceptual reasoning score was 77, placing him in the sixth percentile; and his working memory score of 66 was at the

very lowest end of the scale, in the first percentile. (Tr. 560-61). Given these objective test results, Dr. Ledermann concluded that Keckler had borderline intellectual functioning and poor insight and judgment. (Tr. 560). Given this documented borderline intellectual functioning, Dr. Ledermann opined that Keckler was extremely impaired in his ability to carry out complex tasks and markedly limited in his ability to understand complex instructions. (Tr. 563). The doctor further concluded that Keckler would face marked difficulties interacting with others. (Tr. 564).

Some five months later, in February of 2022, Dr. Ledermann issued a second report which reached starkly inconsistent conclusions regarding Keckler's mental limitations. (Tr. 689-96). Dr. Ledermann now concluded that Keckler had average intellectual functioning and fair insight and judgment. (Tr. 692). According to the doctor, Keckler no longer experienced any extreme or marked impairments. Rather, Dr. Ledermann now opined that Keckler—who had borderline intelligence and an extensive history of volatile anger—was only mildly impaired in terms of his ability to work with others, and experienced mild to moderate difficulties understanding and performing complex tasks. (Tr. 694-95).

Dr. Ledermann's second opinion was curious on several scores. First, the doctor made no efforts to acknowledge or reconcile this opinion with the very

9

different assessment which she had issued five months earlier. Moreover, the doctor's opinion completely ignored her own objective data, the September 2021 IQ testing of Keckler which documented his severe borderline intellectual functioning.

The medical record also contained two opinions from nontreating, nonexamining state agency experts, Dr. George Ondis and Dr. Peter Garito. (Tr. 95-120, 123-34). While these nonexamining sources stated that Keckler could meet the emotional demands of the workplace, in at least one instance the rationale for this determination was both muddled and internally inconsistent. Specifically, the March 2022 reconsideration opinion of Dr. Peter Garito stated in part that:

> Claimant's memory is adequate. Claimant can attend regularly and would not need special supervision. Claimant understands and follows directions. Claimant gets along with others and can behave appropriately in social situations.

(Tr. 148). This narrative was entirely at odds with the clinical evidence documenting Keckler's longstanding anger issues as well as the IQ testing performed by Dr. Ledermann in September 2021.

## B.    **Administrative Proceedings**

It is against this backdrop that Keckler's case was heard by an ALJ on August 16, 2022. (Tr. 34-67). At that hearing Keckler and his mother both testified providing further confirming proof of these mental impairments. For example, in his testimony

Keckler demonstrated his limited intellectual abilities as he struggled to respond to straightforward questions from the ALJ. (Tr. 38-40). Keckler's mother, in turn, confirmed his emotional volatility in her testimony, describing frequent emotional outbursts experienced by her son. (Tr. 53-60). Notably, in her testimony Keckler's mother indicated that his anger had, in the past, been directed at coworkers in addition to family members. (Tr. 54).

Following this hearing on August 26, 2022, the ALJ issued a decision denying Keckler's claim. (Tr. 12-28). In that decision, the ALJ first concluded that Keckler met the insured status requirements of the Social Security Act through September 30, 2025. (Tr. 17). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Keckler had the following severe impairments: lumbar degenerative disc disease, diabetes mellitus, obesity, phonological disorder, bipolar disorder, learning disorder, and attention deficit-hyperactivity disorder. (Id.)

The ALJ then concluded at Step 3 of this sequential analysis that none of these impairments were *per se* disabling. (Tr. 18-20). However, the ALJ's analysis made no mention of Keckler's September 2021 IQ testing and, despite the thoroughly documented record of emotional volatility, concluded that he was only mildly impaired in interacting with others. (Id.)

11

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with a limitation to frequent stoop and kneel as well as occasional balance, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds. He must avoid exposure to vibrations, heights, and machinery. He is limited to occupations that require only occasional verbal communication. Work is limited to simple, routine, repetitive tasks in a work environment free from fast paced production and involving only simple work-related decisions with few, if any, workplace changes.

(Tr. 20).

In making the RFC determination, the ALJ rejected the treating source opinion of Dr. Medzoyan and the initial consultative opinion of Dr. Ledermann which was grounded upon Keckler's IQ test results. (Tr. 25-26). Instead, the ALJ treated Dr. Ledermann's second opinion as the lynchpin of the disability analysis, stating:

> Regarding mental health, the undersigned is persuaded by the February 2022 medical opinion of Kathleen Ledermann, PsyD (Exhibit B21F), that finds the claimant with no more than moderate limitation in carrying out complex instructions and in making judgments on complex work-related decisions and no more than mild limitation in social interaction; in understanding, remembering, and carrying simple instructions; in understanding and remembering complex instructions; and in making judgments on simple work-related decisions.

(Tr. 25).

The ALJ's decision did not fully reconcile this judgment with the two touchstones for medical opinion analysis, consistency and supportability beyond stating that: "This opinion is consistent with the objective clinical findings and the longitudinal treatment records." Therefore, the ALJ provided no further explanation regarding how Dr. Ledermann's two irreconcilably inconsistent opinions satisfied the consistency test. Nor did the ALJ explain how Dr. Ledermann's second opinion, which ignored the doctor's own IQ testing results from five months earlier, drew greater support from the objective clinical findings.

Having reached these conclusions, the ALJ found at Step 4 that Keckler could not return to his past work but concluded at Step 5 that there were other jobs in the national economy he could perform. (Tr. 26-28). Accordingly, the ALJ denied this claim. (Id.)

This appeal followed. (Doc. 1). On appeal, Keckler challenges the ALJ's assessment of his severe and nonsevere impairments, questions the scant attention given by the ALJ to Keckler's IQ test results, and contends that the ALJ erred in assessing the medical opinion evidence. This case is fully briefed and is, therefore, ripe for resolution.

Upon consideration, we find that the ALJ failed to sufficiently articulate the basis of this decision and the cursory articulated rationale for the decision was not supported by substantial evidence allowing for meaningful judicial review. Therefore, we will direct that this case be remanded for further consideration by the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir.

14

1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets

16

the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In this setting the court of appeals has emphasized that it is the responsibility of the ALJ to offer a valid explanation, for any mental RFC. Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019).

17

**B.**  **Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence.**

The plaintiff filed this disability application in 2020 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

19

Case 1:23-cv-00764-MCC    Document 15    Filed 11/18/24    Page 20 of 26

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Despite providing a new analytical framework for ALJs, these regulations

"[do] not authorize lay medical determinations by ALJs" and do not "relieve the ALJ

of the responsibility of adequately articulating the basis for a medical opinion

evaluation." Blackman v. Kijakazi, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022) quoting

Kenyon v. Saul, No. 1:20-CV-1372, 2021 WL 2015067, at *4 (M.D. Pa. May 19,

2021). Therefore, the ALJ must still provide an adequate, articulated rationale when

resolving conflicts in the medical opinion evidence. In undertaking his task

oftentimes, an ALJ must evaluate various medical opinions. Judicial review of this

aspect of ALJ decision-making is still guided by several settled legal tenets. First,

when presented with a disputed factual record, it is well-established that "[t]he ALJ

– not treating or examining physicians or State agency consultants – must make the

ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667

F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may

choose whom to credit but 'cannot reject evidence for no reason or for the wrong

reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994

F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate,

articulated rationale, it is the province and the duty of the ALJ to choose which

medical opinions and evidence deserve greater weight.

> Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

> Finally, one other cardinal principle governs this medical opinion analysis. An

ALJ may not simply ignore and fail to address material medical evidence. As the

Third Circuit has noted:

> This Court has long been concerned with ALJ opinions that fail properly to consider, discuss and weigh relevant medical evidence. See Dobrowolsky v. Califano, 606 F.2d 403, 406–07 (3d Cir.1979) ("This Court has repeatedly emphasized that the special nature of proceedings for disability benefits dictates care on the part of the agency in developing an administrative record and in explicitly weighing all evidence."). Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided. See Cotter, 642 F.2d at 706 (listing cases remanded for ALJ's failure to provide explanation of

reason for rejecting or not addressing relevant probative evidence).

Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001). Therefore, a complete failure

to analyze, address, or acknowledge relevant medical compels a remand.

**D.      This Case Will Be Remanded to Consider the Medical Opinion and Clinical Evidence**

With respect to Keckler's presenting mental impairments, his borderline

intellectual functioning and his volatile temper, there was a significant body of

clinical treatment evidence and objective medical testing which supported the

severity of these impairments. This evidence included both multiple clinical

encounters documenting his volatile temper over time as well as IQ testing done by

Dr. Ledermann in September of 2021 which disclosed that Keckler's full-scale IQ

was 73, a score which placed him in the fourth percentile; his verbal comprehension

index score was 70, placing him in the second percentile; his perceptual reasoning

score was 77, placing him in the sixth percentile; and his working memory score of

66 was at the very lowest end of the scale, in the first percentile. (Tr. 560-61).

The ALJ's decision acknowledged the existence of this IQ testing in passing,

(Tr. 23), but then neglected to address these material objective testing results in its

analysis of the medical opinion evidence beyond discounting the persuasiveness of

Dr. Ledermann's September 2021 opinion which rested upon this objective testing

data. Moreover, the ALJ's rationale for discounting Dr. Ledermann's first opinion and the treating source opinion of Dr. Medzoyan, who had cared for Keckler over two decades, was both meager and suspect. According to the ALJ, these opinions were not consistent with the objective clinical findings and longitudinal treatment records. (Tr. 25).

On this score, the ALJ seems to have erred. Quite the contrary, Dr. Medzoyan's treating source opinion is completely congruent with her treatment records which thoroughly document Keckler's recurring anger issues. Likewise, Dr. Ledermann's initial medical opinion was supported by her IQ testing of Keckler, testing that revealed his borderline intellectual functioning. Instead of following this objective evidence to its logical conclusion, the ALJ chose to adopt Dr. Ledermann's second opinion, even though it did not consider the doctor's own objective testing data, the IQ test she had previously administered to Keckler.

This was error. In this setting it is well-settled that the failure of  medical sources to adequately address relevant IQ testing data often compels a remand. See Cortes v. Comm'r of Soc. Sec., 255 F. App'x 646, 652 (3d Cir. 2007). That is precisely what happened here. Dr. Ledermann's second opinion failed to account for the IQ test results set forth in her first opinion. This error, standing alone, calls for a remand.

Further, the ALJ's assessment of Dr. Ledermann's two medical opinions is wanting. As we have noted, the touchstones for any medical opinion analysis are consistency and supportability. In this case, the ALJ's medical opinion analysis relating to Dr. Ledermann fails on both scores. First, by identifying Dr. Ledermann's second opinion as one of the medical lynchpins for this decision the ALJ's decision fails the consistency test. The only thing that can be definitely stated regarding Dr. Ledermann's two opinions is that they are irreconcilably inconsistent. Given this patent inconsistency, the choice of the doctor's second opinion over her first opinion can only be justified if that second opinion clearly draws stronger support from the objective medical evidence.

And it does not. Quite the contrary, this second opinion actually draws less support from the objective clinical record. For example, Dr. Ledermann's initial opinion was consistent with the clinically supported evidence and opinions[3]

---

[3] We use the plural "opinions" because Dr. Medzoyan issued two opinions in May of 2021 and June of 2022. (Tr. 559-63, 701-05). These two assessments made consistent findings concerning the severity of his symptoms. Dr. Medzoyan described Keckler's prognosis as poor given his high risk of explosive anger outbursts with little provocation. (Tr. 459, 701). According to the doctor, Keckler would frequently be off task at work and would miss work up to ten days a month. (Tr. 463, 705). Dr. Medzoyan also opined that Keckler's anger outbursts would prevent him from working on a sustained basis. (Id.) The ALJ's decision, however, only notes one opinion by Dr. Medzoyan in May of 2021. (Tr. 25). Thus, the ALJ

expressed by Keckler's longstanding treating physician, Dr. Medzoyan, a factor which would tend to give it greater credence. Further, Dr. Ledermann's initial opinion, which described Keckler as significantly impaired, was completely in accord with the IQ testing she performed which revealed Keckler's limited intellectual functioning. In contrast, Dr. Ledermann's second opinion, which the ALJ deemed persuasive, failed to even acknowledge or address the doctor's own IQ test results for Keckler. Therefore, the ALJ's decision rests on an erroneous premise: the notion that when presented with two inconsistent opinions from the same medical source, the ALJ may rely upon the opinion which garners less support from the treatment record and testing data.

Simply put, we find that this case is governed by the familiar proposition that, "[w]here there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001) (citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981) (listing cases remanded for ALJ's failure

---

seems not to have even recognized the existence of this second treating source opinion, an error which also calls for a remand here.

to provide explanation of reason for rejecting or not addressing relevant probative evidence)).

Therefore, finding that the ALJ failed to sufficiently articulate the basis of this decision and the cursory articulated rationale for the decision was not supported by substantial evidence allowing for meaningful judicial review, this case will be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.    __Conclusion__

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be REMANDED for further consideration by the Commissioner.

An appropriate order follows.

> _s/ Martin C. Carlson_
> Martin C. Carlson
> United States Magistrate Judge

DATED: November 18, 2024